Welch, J.
The questions presented in this ease involve, mainly, the constitutionality and validity of the supplementary act of April 16, 1868, of which the following is a copy:
“An act supplementary to the act entitled ‘An act to preserve the purity of elections,’ passed March 20, 1841, and to protect the judges of elections in the discharge of their duties. (Ohio L.)
“Section 1. Be it enacted by the general assembly of the State of Ohio, That it shall be the duty of the judges of election to challenge any person offering to vote at any election held under any law of this State, having a distinct and visible admixture of African blood, and shall tender to him the following oath or affirmation:
“‘You do solemnly swear (or affirm) that you will, to the best of your knowledge and belief, full and true answers make to such questions as may be put to you touching your ^qualifications as an elector; ’ and thereupon the said judges, or one of them, shall put to him the following questions:
“ 1. What is your age ?
“ 2. Where were you born ?
“3. Were your parents married, and did they live together as man and wife ?
“ 4. Had your parents, or either of them, a visible and distinct admixture of African blood ?
“ 5. In the community in which you live are you classified and recognized as a white or colored person, and do you associate with white or colored persons ?
“ 6. Are there schools for colored children in operation in the township, village, or ward in which you live; and if you have children, do they attend such schools, or do they attend the common schools organized for white children, under the laws of the state ?
“ Seo. 2. After the examination of the person challenged, as provided in the preceding section, the judges of election shall, unless the vote of said person is rejected, require him to produce before them two credible witnesses, to whom shall be tendered by .said judges the followiug oath or affirmation :
“ ‘ You and each of you do solemnly swear (or affirm) that you will fully and truly answer all such questions as may be put to you touching the qualifications of [the name of the person challenged!] as an elector.*
*624 “ Thereupon the judges, or one of them, shall put to each person, respectively, the following questions :
“ 1. Are you acquainted with [the name of the person challenged]; if so, for how long a time have you known him ?
“ 2. Do you know when, where, and in what state he was born?
“3. Were you acquainted with his parents or either of them? If yes, did such parents, or either of them, have a distinct and visible admixture of African blood, and were they married, or-did they live together as man and wife ?
“ Sec. 3. A record in writing of the questions and answers required to he given and made in the preceding sections of this [acf\ shall be kept and filed with the poll-books for public inspection, and that the conducting of such examinations and *thc making of the record thereof shall not be permitted to delay the regular business of.such elections, in receiving votes where no such examination and record aforesaid is required by this act to be made, and to avoid such delay, it shall be the duty of such judges of election to employ an additional clerk or clerks to make such record, who shall be paid as other clerks at such elections; and said clei’ks shall first be duly sworn to faithfully and correctly make such record, and the said judges of election, or any party-challenging, may put such other questions as may'seem to them necessary and proper, and the judges of election, or the party challenging, may call and have examined any other witnesses in the premises that may seem to them proper.
“ Sec. 4. No evidence shall be received as to the admixture of white blood which is based on the opinion of the person challenged' or of the witness testifying in his behalf, founded merely upon appearance, unless the facts are fully stated as to the parentage of the-person challenged; and no evidence of reputation as to parentage shall be received, unless the parties about whom such reputation-exists are first proved to have been married, or to have lived together as man and wife.
“ Seo. 5. If the party challenged, or any person interrogated as-aforesaid in his behalf, shall refuse to answer fully any question as herein prescribed, the judges shall reject the vote; and if the judges shall be satisfied, from the statements of all the persons examined and the evidence adduced, that the person offering to vote is a ‘white male citizen of the United States,’ before receiving his-ballot, they shall tender him the following oath or affirmation :
*625 “ ‘You do solemnly swear (or affirm) that, to the best of your knowledge and belief, you are a white male citizen of the United States, and know the fact to be so from a knowledge of both your parents-- and your pedigree;’ and if the judges shall then receive said vote, the words, ‘ challenged on the ground of visible admixture of African blood,’ shall be entered on the poll-book opposite said voter’s-name.
“Sec. 6. That any person who, on oath or affirmation, shall procure the right to vote for himself or any other person, by willfully and corruptly deposing, declaring, or affirming any ^matter to be a fact, knowing the same to be false, or shall, in like manner, deny any matter to be fact, knowing the same to be true, shall be-deemed guilty of perjury, and on conviction thereof shall bo imprisoned in the- penitentiary and kept at hard labor not more than ten years nor less than three years.
“Seo. 7. Any judge of election receiving the vote or sanctioning the reception of the same from any person having a distinct and visible admixture of African blood, contrary to the provisions of this-act, shall, on conviction thereof, be imprisoned in the county jail not more than six months nor less than one month, and shall also be-liable to a civil action for a penalty in the sum of five hundred dollars, which may be brought against him by any elector of the county or district in which the vote was received, in the court of common, pleas of any county in the state where process can be served upon him; provided there shall be but one recovery for each violation of this act, and a failure to prosecute or convict shall not in any manner affect the right to proceed for the recovery of such penalty.
“Seo. 8. That any person aiding, abetting, or counseling any judge of election to receive a vote, or aiding, abetting, or counseling any person to offer his vote in violation of the provisions of this act, or any person in any manner impeding the challenging of persons as herein provided, shall, on conviction thereof, be imprisoned in the county jail not more than six months nor less than one month, and shall also be liable to a civil action for a penalty in the sum of one hundred dollars, which may be brought against him by any elector of the county or district in which the vote was received, in the court of common pleas of any county where process can be served upon him; provided there shall be but one recovery for each violation of this act, and a failure to prosecute or convict shall not in *626 any manner affect the- right to proceed for the recovery of such penalty.
“Seo. 9. Any.judge of election sued for rejecting the vote of any person having a distinct and visible admixture of African blood, may change the venue to any county he may elect in the judicial district in which he resides, on making an ^affidavit that, according to the best of his belief, justice requires such a change to be made.
“ Seo. 10. In all suits brought against any judge of the election for rejecting the vote of any person having a distinct and visible admixture of African blood, the party bringing the action shall be required, by the court, on trial, before he shall be entitled to recover, to establish that he is a white male citizen of the United States, in the same manner, and by the same evidence, both as to the kind of testimony and number of corroborating witnesses, as prescribed by the provisions of this act in case of challenge, and no evidence 3hall be received as to the admixture of white blood based on the opinion of witnesses, founded on personal appearance, unconnected with a full statement of the facts as to the parentage and pedigree of the party bringing the action; nor shall any proof be received as to the reputation or parentage, unless the marriage of the parties is first proved, in reference to whom such reputation exists, or that they lived together as man and wife, and were recognized as such, and no recovery shall be had in such action unless the jury are satisfied from the evidence .that the judge of the election, in rejecting such vote, acted corruptly or in bad faith; and the court shall so instruct the jury, and where said instruction is oil-fitted or refused, the defendant shall be entitled to a new trial.
“Seo. 11. Any candidate for office at any election may, on making an affidavit before a justice of the peace or notary public that he believes it necessary to the enforcement of the provisions of this act, call on the sheriff of the proper county, and, on presenting him such affidavit, require him to furnish a sufficientposse, to be paid as in other cases, to protect any poll where there is a probability that the challenging under the provisions of this act will be impeded, and its other requirements disregarded; and any sheriff refusing to furnish said posse and to protect said poll from all violence and interference by any person or persons whatsoever, shall, on conviction thereof, be imprisoned in the county jail not exceeding thirty days nor less than ten days, and shall also be liable to civil action by any elector for a penalty of one hundred dollars, which may be *627 brought against him in the'*court of common pleas of any county where process may be served upon him; provided there shall be but one recovery for every such violation aforesaid.
“ Seo. 12. No challenge under the provisions of this act shall be regarded by the judges of election where the person challenged has no visible admixture of African blood; and any person challenging an elector in bad faith, or where there is no probable cause for such [challenge on account of a visible' admixture of African blood, shall, on conviction thereof, be imprisoned in the county jail not more than six months nor less than one month, and shall also be liable to a civil action for a penalty in the sum of five hundred dollars, which action may be brought against him by the person so challenged, in any county where process can be served upon him.
“ Seo. 13. All prosecutions under the provisions of this act shall be by indictment before the court of common pleas in the county where the offense was committed, and all penalties recovered under this act shall be paid, one-half to the party in whose name the suit is brought, and the other half into the county treasury where the suit is determined, for the benefit of the common school fund.
“ Seo. 14. This act shall be given specially in charge to the grand jury at each term of the court of common pleas by the presiding judge thereof, and shall take effect and be in force from and after its passage.”
As connected with this act, is to be considered also the concluding clause in a proviso, upon the same subject, contained in section 3 of the act of April 17,1868 (65 Ohio L. 104), amendatory of the general election law. This section 3, which is an amendment of section 24 of the general law, provides for penalties against judges of election who “ shall refuse to receive, or shall sanction the rejection of a ballot from any person, knowing him to have the qualifications of an elector,” and then concludes with this proviso: “ Provided, that the provisions of this act, [that is, the general act, of which this is section 24], and the penalties thereto, shall not apply to clerks or judges of election for refusing to receive the votes of persons having a distinct and visible admixture of *African blood, nor shall they be liable for damages by reason of such rejection.”
If these enactments are constitutional, it is plain that the district court erred in holding that none of the defenses interposed *628 was a good bar to the action. That Collins refused to answer fully all the questions put to him; that either or any of the witnesses-produced by him failed to answer the questions put to them; that Collins failed to take the final oath prescribed in section 5 of the act of April 16, 1868; that the evidence, elicited by direct answers to the statutory questions, failed to show that Collins was a white man — either of these defenses was a good bar to the action, by express provision of the act of April 16,1868. Besides, it is to be observed, the demurrer to the answer reaches back to the petition, and if it is bad, no matter if-the defenses are all bad, the demurrer must be sustained, and the action fail. If these enactments are valid, the petition itself is probably bad, for two reasons : 1. Because it does not show that in rejecting the vote the judges acted “ corruptly or in bad faith;” and, 2. Because it does show that the vote rejected was that of a person having a visible admixture of African blood, in which case it is provided that “ the judges shall not. be liable for damages for such rejection.” Possibly the two provisions last referred to may be fairly construed to mean that where there is no corruption or bad faith, there shall be no right of action ; and where corruption or bad faith is shown, an action may be sustained, but no actual damages — that is, no more than mere nominal damages — shall be recovered. This is, however, quite immaterial in the present case, as abundant ground of defense under the statute is set up in the answer.
The whole case, therefore, resolves itself into a question of the validity and constitutionality of these provisions of law — the act of April 16, 1868, in connection with the clause denying the liability of the judges for damages, in the act of April 17,1868. It is quite evident that all the provisions of the act of April 16, and the single provision of that of April 17, must stand or fall together. They are all parts of a single scheme, having a common object, and are so interwoven, and so dependent one upon the other, that, no single provision, at least no *one that is relied upon as a defense in this case, can be made to stand, and have full force and effect, if the others are held to be in violation of the constitution. The single question then is — are these enactments constitutional and valid ?
The right of suffrage is guaranteed by the constitution of Ohio to “white male citizens.” By the constitution of 1802, it was guaranteed to “ white male inhabitants.” Under the constitution of J *629 1802 it was repeatedly held by the Supreme Court of the state that men having an admixture of African blood, with a preponderance of white blood, were white men within its meaning, and had the same right to vote as persons of pure white blood. See Polly Gray v. The State, 4 Ohio, 353; Williams v. School Directors, Wright, 579; Jeffries v. Ankeny, 11 Ohio, 372; Thacker v. Hawk, 11 Ib. 376; Chalmers v. Stewart, 11 Ib. 386; Lane v. Baker, 12 Ib. 237; Stewart v. Southard, 17 Ib. 402.
The same was held by this court in Anderson v. Millikin et al., 9 Ohio St. 568, to be the meaning and effect of the present constitution. A colored man, therefore, having more white than black blood, is a white man within the meaning of the constitution, and the legislature have no more power to deny or intrench upon his right to vote than they have to deny or intrench upon that of a man of pure white blood. As electors, both stand equal before the law, and are regarded as white men. If the law in question would be unconstitutional when made applicable to white men of any other description, then it is unconstitutional in its present form. If the legislature have power to deny or abridge the right of suffrage of white men of visible admixture, then they can exercise the same power in regard to white men of black hair, of low stature, of small fortune, of unorthodox religious opinions, or of any other description. Between the legislative power and the legal elector, no matter who or what he is, the constitutional provision stands as a bulwark for the protection of his right to vote.
What the legislature can not do directly it can not do by indirection. If it has no power expressly to deny or take away the right, it has none to define it away, or unreasonably to abridge or impede its enjoyment by laws professing to be merely remedial. The power of the legislature in such cases *is limited to laws ■regulating the enjoyment of the right, by facilitating its lawful exercise, and by preventing its abuse. All reasonable latitude should be allowed to the legislature in the exercise of this power of regulation, and every reasonable intendment in favor of the constitutionality of laws enacted for that purpose should be made by the courts. Such laws are not to be held unconstitutional unless clearly so, and if they will at all bear a construction which makes them consistent with the constitution, they are to receive that construction, and so to be upheld. The true line between laws which take away ■or abridge the right of suffrage, and those which may lawfully be *630 enacted to regulate its exercise, is laid down by the Supreme Court of Massachusetts in Capen v. Foster, 12 Pick. 488. It was there held, substantially, that laws of the latter description must be reasonable, uniform, and impartial, and must be calculated to facilitate and secure, rather than to subvert or impede the exercise of the right to vote.
Tried by this rule, what is the character of the law in question? Is it unreasonable, partial, or calculated to subvert or impede the exercise of the right of suffrage by the class of voters to whom it applies? Is it clearly such? We are unanimous in the opinion that it is, and that it has all these unconstitutional elements combined. We speak of the effect, the scope, and spirit of the law, and not of the ultimate object of the legislature, whom as a co-ordinate branch of the government we are bound to respect, and to whom we would attribute no unlawful purposes. But that the effect of the law is to impede the exercise of the right of suffrage by the class of voters referred to, and, to a great extent, to deny the right, and that its operation would be partial and unjust to an extreme degree, any candid man has only to read the law to admit.
In the first place, the law is partial, and calculated to impede the exercise of the right of suffrage, by imposing upon the class of voters referred to, unreasonable burdens of proof, and limitations as to kind and amount of evidence, which are not imposed upon other voters. They are challenged — nay, must be challenged — not because they are not, in law, white men, but because of their visible admixture. If they are prima *facie white men, or even, as in the case at bar, are plainly and clearly white men, the burden of proof, contrary to all rules of evidence, is cast upon them nevertheless.
This burden they are required to remove by a particular specified description of proof, which, in many cases, is impracticable. It being assumed, that they are in law black men, no drop of white blood can be proved into'their veins by “reputation,” by “appearance,” or by “opinion;” while the challengers are unlimited as to the kind of proof. Again, they seem to be limited to their own testimony and that of two witnesses, and are confined, in giving that testimony, to answering certain prescribed and apparently immaterial questions, which give them no aid; while their adversaries are unlimited as to the number of witnesses they may call, and the questions they may ask, as well as in regard to the kind of *631 testimony to be elicited. An' admixture of black blood may be proven by reputation, appearance, or opinion, and by any number of witnesses that may “ seem proper” to the challengers, who may ask “ an j'other questions” that may “seem to them necessary;” but white blood must be shown by direct and positive testimony, and in many, if not most cases, such testimony as can not be supposed to be within the power of the voter.
If, notwithstanding these unequal rules and restrictions, the voter succeeds in accomplishing an apparent impossibility, and the judges thus become “satisfied” that he is a “white male citizen of the United States,” before receiving his ballot they are to tender him an oath or affirmation, to the effect that he not only believes himself to be a white male citizen, but that he “knows the fact’to be so from a knowledge of both his parents'and his pedigree.” The refusal tó take this oath or affirmation, of course works a forfeiture of his right to vote; for, otherwise, the tender of it would be without object, and would be an idle ceremony. So, his refusal, or the refusal of either of his witnesses, to “ answer fully ” any of the questions propounded, works a like forfeiture. If answering “ fully ” means answering according to the facts of the'case, such an answer would be impossible in most cases. If it means merely answering according to knowledge, then it is enough to say his right to vote is placed by the lawin the hands of *his witnesses. I believe the former to be its true meaning. Otherwise it would be folly to require the voter to produce the two witnesses — a requisition which he could easily evade, by calling witnesses who had little or no knowledge on the subject; and if answering “ fully ” in the case of the witnesses is to have that meaning, it must receive the same meaning in case of the voter himself. The requisition to produce two witnesses must be held a requisition to produce testimony in corrobpration of testimony already given by the candidate himself. If so, it is a requisition that in most cases could not be complied with, and the vote would have to be rejected. '
The law is also unreasonable, and calculated to impede rather than facilitate the exercise of the right of suffrage by white’citizens of less than half African blood, in that it is so framed as to be liable^ at least in the judgment of' unpracticed men — such as usually act as officers of an election — tó the construction that no man having' African blood is a white man or has a right to vote.' Indeed, it is extremely doubtful whether such is not the legitimate interpreta *632 tion of the law. The ground of the challenge is, not that the voter has more than half black blood, but that he has some black blood. The quantity of black blood — the proportions of black and white blood — although the most material matter to be inquired of in the case, and indeed that to which all the provisions of the law ought to relate, are carefully excluded from inquiry. The man of pure black blood is not required to be challenged. Throughout the whole act but two classes are mentioned. One of these is a “ person having a visible admixture,” and the other is a “ white male citizen -of the United States.” Ail the questions put to the candidate, as well as those put to his witnesses, tend only to show whether he is, or is not, a person of visible admixture. The case begins with a challenge that he is a person of visible admixture, and then he is required to acquit himself of the charge, by his own testimony, and that of two other witnesses, by showing whether his parents were of visible admixture, and with whom he and his children associate I Any and all questions as to the quantity or proportions of the blood-are carefully excluded. If this is not the technical interpretation of the act, its .true meaning is so *well hidden, and lies so -deep, that none but lawyers would be likely to reach it. It is well known to lawyers that the words “ white man ” have a legal and ■constitutional meaning, quite different from their popular sense. A law calculated to facilitate and secure the enjoyment of the right ■of suffrage by white men who have African blood, would promote ■that object by at least intimating, in some part of the law, what is nowhere intimated in this law, that by the terms “ white male •citizens ” colored persons of less than half black blood are not excluded. On the contrary, the .law in question purports throughout to use the terms in their popular sense. And when it is seen that high penalties, and unrestricted liabilities, await the judges who err in receiving the vote contrary to the law, and that perfect impunity is guaranteed to them in case of its rejection, it is easy to see how, in the hands of unpraeticed, though honest judges, the exercise of the elector’s right to vote would be likely to be impeded or denied. All doubts — and the law, whether from design or not, is full of doubts — would be resolved against the elector.
The most objectionable feature of the act, however, and that which is calculated most effectually to impair the right of the colored elector, is its unjust discrimination against him in regard to penalties, liabilities, and safeguards, for its protection or against *633 its abuse. This is an important consideration, because without a ■sanction the law has no operative force or vitality. If the sanctions are all on- one side, the operation of the law will necessarily ■be partial and unjust. Such, we think, is plainly the character of this law, and .such must be its practical effect. If any judge of •election receives the vote of a person of visible admixture, or sanctions its 'reception, contrary to the provisions of the act, although he may act in good faith, yet he is liable to be imprisoned from ■one to six months, and to a penalty of five hundred dollars.for every such mistake; and in order to insure his prosecution for the penalty, half of it is given to any elector bringing suit therefor, ■and an acquittal on prosecution for the offense is no bar to an action for the penalty. On the other hand, if the judges err in rejecting the vote contrary to the provisions of *the act — nay, if they •reject it “corruptly and in bad faith” — no punishment or penalty is to follow; if a civil action can be sustained at all, which is, to say the least, doubtful, no actual damages can be recovered; and the case or prosecution can only be sustained by a kind of proof that is, in most cases, impossible. If the judges err in rejecting the vote of any other voter than those of visible admixture, though they -act in good faith, they are still liable to a civil action for full damages, and if they reject it in bad faith they are liable to punishment ; and in either of the latter cases there are no restrictions as to the kind of proof required upon the trial, and no part of the penalty goes to the prosecutor. The judges are made liable for rejecting and for receiving the vote of other electors, and for receiving that of the colored voter, but they are guaranteed perfect impunity for rejecting the vote of the latter, even where it is done “ corruptly or in bad faith.” For any official act done corruptly they •are made liable, with the single exception that they may with perfect impunity reject a colored man’s vote.
The same is the case with any person “ aiding, abetting, or counseling” any judge, etc. He is only made liable for aiding, abetting, or counseling the “reception” or “offering” of the vote. He may counsel its rejection with perfect impunity. So in regard to •“ impeding ” or preventing the operation of the law.. Any person may, with impunity, impede or prevent the voting, or the offering of a vote by the colored man, but if he impedes the “ challenging” he is liable to ■ penalties and imprisonment. Safety is m.ade to consist in doing all the “ aiding, abetting, counseling,” and “ im *634 peeling ” against the colored voter, and in favor of his adversaries. If a judge is sued for rejecting the vote of a colored person, he. (the judge) may change the venue, but the colored person can not; and the change maybe-made on the judge’s affidavit alone, and to any county he may elect in the whole judicial district. In other words, he may choose his own forum. No such right to change the venue is allowed in case of an action by any other elector for re-, jeeting his vote. The same partiality and discrimination appears in other parts of the act, and in fact throughout its provisions. It is ma,de perjury by *the act to “procure ” the right of the colored person to vote, by false swearing, but it is a crime by false swearing to deny it or effect its disallowance. Tbe posse of the. sheriff, provided for in the 11th section, is required to be furnished only “ where there is a probability that the challenging under the provisions of this act will'be impeded.” . The probability that the voting of the colored man will be impeded, or. even that the challenging of the pure white man will be impeded, or that any other disturbance will take place, requires no posse. It is only the challengers of the colored voter who are awarded this extraordinary protection. With all the odds in their favor, by the other provisions of the act, they alone are to have full protection, and be insured against all possible interference. One would think that without this posse there was protection enough for the challenger, in the apparent impossibility of proving the colored man’s right, in the difficulty of procuring witnesses to run the risk of prosecutions for perjury, and'in the almost certain liabilities to punishment and penalties fox’ aiding, counseling, or interfering in his behalf. Surely, if any such protection is needed, it is needed upon the side of .the voter and not of the challenger.
For these reasons, and others apparent upon the face of the act, it is manifest to us that it can not be supported as a law to facilitate and protect the right of suffrage and to regulate its exercise within the scope of legislative power. Its manifest tendency and effect are to subvert instead of protect the x’ight of suffrage, and to impede instead of facilitate its exercise in a particular class of voters. If it acknowledges their right at all, it does so grudgingly, and by mere implication. It discriminates against them in all its penalties; its liabilities, and its safeguards, as well as in regard to the. amount and kind of proof required of them, both at the polls and in courts of justice. It therefore lacks that element of faixmess and *635 impartiality which should characterize all laws of that description. Under its provisions, fully carried out, not one perhaps in ten of the class proscribed by it could exercise the right of voting. It presents them with difficulties and impediments at every step, such that, if they are not absolutely insurmountable, a quiet ^peace-loving citizen, in most cases, would choose to relinquish his right to vote rather than encounter them.
It is not only true that the act is calculated to impair and defeat the exercise of the colored man’s constitutional right to vote, but any candid man must admit that such seems to be its leading, nay its only object. It seems to be a studied and cunningly devised scheme to effect that single object to the utmost that it could be effected, without expressly and dárectly violating the constitution of the state.
We therefore hold the act of April 16,1868, with the clause in the subsequent law referred to, to be unconstitutional and void.
As to the eighth ground of defense, by which it is probably intended to raise a question as to the constitutionality of the provisions of said act of April 17, 1868, other than the clause referred to, we have only to say that in our judgment no such question arises. That part of the answer setting up this defense admits that Collins “ had resided in said ward for more than thirty days next preceding said election.” This admission establishes his right to vote, so far as the question of residence is made, and it would be going out of the case to consider questions regarding the constitutionality of the law.

Motion overruled.

Dat, C. J., and White, Brinkerhoee, and Scott, XT., concurred.